Lee, J.
Upon the trial of this cause numerous questions were raised, and various exceptions taken by the plaintiffs, in .error, all of which are made grounds of assignment of error here. The bills of exceptions are numbered from one to eight inclusive, and I propose to consider them in the order in which they are numbered, excepting the fourth, which will be again referred to after the others shall have been disposed of.
The first exception was to the opinion of the court permitting the deed from Joseph Blake and others to- *452 Elias H. Derby, dated 31st of December 1798, to be read in evidence to the jury. This deed was recorded in the General court on the 12th of November 1800, upon a certificate under the hand of the clerk of the court of general session for the county of Suffolk in ° ^ the state of Massachusetts, that the execution of it by the grantors had been duly proven in said court on the 3d of December 1799, by the three subscribing witnesses; and all of the said grantors are described as being of Boston in said county of Suffolk. By the act for regulating conveyances, passed 12th December 1792, 1 Rev. Code, Pleasants’ ed. 1814, p. 218, as amended by the act of the 26th of December 1794, Ibid. 462, it is provided that where a party who shall sign and seal any deed for the conveyance of lands, shall not reside in Virginia, the acknowledgment by such party, or the proof by three witnesses, of the sealing and delivery thereof, before any court of law, certified by such court in the manner such acts are usually authenticated by them, and offered to the proper court to be recorded within two years after the sealing and delivery, shall be as effectual as if done in the last mentioned court. But it'is objected that the authentication of this deed was not such as to render it admissible to record, because the certificate of the clerk of the court in Massachusetts is not under the seal of the court, and that there is nothing to show that it was in the usual form for such acts, and nothing to verify the fact that the party signing himself clerk of the court was in fact such clerk. There is nothing in the act of assembly expressly requiring the certificate in such a case to be under the seal of the court, nor any verification of the character of the officer by whom it shall be given or attested. Noji constat that there is a seal, because though a usual, yet it is not an indispensable incident to a court. And in the absence of any express requirement, that the official character *453 of the party certifying should be verified, his certificate that he is such officer should be deemed sufficient, just as the certificate of a justice of the peace before whom a deposition is taken or a deed acknowledged in another state, that he is such justice, is itself sufficient, without any verification or proof aliunde of his official character. So, as the acts of a court are usually and properly certified by its clerk, the certificate itself is prima facie evidence that the usual form for acts of the kind has been observed. But there is another answer to this objection. This deed is referred to and recited by the commissioners of forfeited lands for the county of Kanawha, in their report to the court; and it is recognized in the decree of the court directing the same to be sold as forfeited. It is thus made a part of the record of the proceeding had for the sale of the land, and as such was properly admissible in evidence to have such legal effect as it might be entitled to, if the record itself were so admissible. So that the objection resolves itself into the objection to the whole record which constitutes the subject of
The second bill of exceptions. It is alleged that such defects and irregularities appeared on the face of this record as should exclude it from going in evidence for any purpose. Whether the supposed irregularities do or do not in fact exist, I think it not veiy material to enquire; because the record being properly authenticated, and being the proceeding of a court possessing competent jurisdiction over the subject to which it related, it is not for a stranger in a collateral proceeding to make such an objection. What might be its effect is another matter; but it was premature to raise this question at that point. It was part of the plaintiff’s claim of title, and of his evidence in support of his claim. Whether it constituted a complete title in itself, or was only a link in the chain, and whether he could connect himself with it, were all questions for *454 subsequent consideration by the court or jury. I think, therefore, the objection to its introduction was quoperly overruled.
The third bill of exceptions was to the opinion of the court permitting a part of the plats of survey offered by the plaintiff which was objected to by the defendants, to go in evidence to the jury. It appears that when the first survey was made in the cause, Hiram Chapman one of the lessors of the plaintiff had acted as a chainman in running seven of the lines, and which were accordingly so laid down in the surveyor’s first report from such running. But this report was recommitted, and all these lines, excepting that designated on the plat as the 'line FH, were run over again with the aid of other and disinterested chainmen; and the surveyor also did other running which he stated he regarded as equivalent to the line FH on said plat, and from which he stated that that line was correctly laid down. And as the plaintiff disclaimed any benefit from the line FH as a measured line, and contented himself with treating it as a line laid down by protraction ; and as the court in permitting the plat to go in evidence to the jury, restricted the use of the line FH in any other way than as a protracted line merely, the objection growing out of the irregularity in the first instance in permitting one of the lessors of the plaintiff to act as one of the chainmen in making the survey, was I think successfully answered and overcome. The six lines in question (other than the line FH) were to be regarded as measured lines in respect of their having been run by the disinterested chainmen employed on the second occasion, and without regard to the running when Chapman was one of the chainmen, and the line FH was not to be regarded as a line actually run, but as a line laid down by protraction ; of the correctness of which the jury were to judge.
Bussing by the fourth bill of exceptions, we come to *455 the fifth, which was to the refusal of the court to permit certain statements of one Paulser Butcher, one of the chain carriers when the original survey under which the defendants claimed was made, to be given in evidence to the jury. Paulser Butcher, it was proven, was dead, and the defendants- had been permitted to prove by one Jasper Butcher, his son, what he had heard his father say in regard to the making of that survey, what running had been done, where one of the lines ran and where a corner would be found. But the defendants also desired to prove that the said Paulser Butcher in 1810 or 1811 (the Porter survey under which they claimed being dated on the 2d of September 1796,) pointed out to the witness the waters on which'the Porter survey should lie, stating what waters the lines would cross, and that the land embraced by said survey lay to the left or south of the line AB, as designated on the plat. To this evidence the plaintiff objected, and it was excluded by the court; but in rejecting it, the court stated that the defendants would be permitted to prove anything the said Paulser Butcher had stated in relation to the running of the said lines, what water courses they crossed in making the survey, or what .natural objects they passed or run to, or any other aet done by the surveyor at the time the survey was made, tending to show where it lay. In this ruling of the court, I cannot perceive that any error was committed to the prejudice of the defendants. The rule touching the admissibility of hearsay evidence was laid down as broadly as they could claim it should be; and the case of Overton v. Davisson, 1 Gratt. 211, relied upon by the plaintiffs in error, furnishes no authority for admitting the rejected evidence. In that case the evidence which the court held to be admissible was the declarations of the surveyor and of one of the chain carriers, (both of whom were dead,) as to the execution of the surveys them *456 selves, and where they had marked a poplar as the beginning corner of the survey number 1. And the rule is stated to be that in a controversy touching the boundary or locality of a tract of land granted by the commonwealth upon a survey made by an authorized surveyor, the declarations of such surveyor, or of a chain carrier or other person who was present at such survey, as to the acts done by or under the authority of such surveyor in making the survey, are properly admissible unless plainly irrelevant; provided they were not made post litem motam, and are not in contradiction of 'the surveyor’s official report. Here the declarations of the chain carrier that were rejected were not in relation to any act done by the surveyor or under his authority at the time of making the survey, but were rather in the nature of opinions or deductions of the chain carrier from facts which he supposed to be within his knowledge, but which he failed to state. They are clearly not within the rule propounded in Overton v. Davisson, and were I think properly rejected by the court.
The defendants having given in evidence the patent under which they claimed title, and also adduced testimony tending to prove that it should be located as they claimed, so as to embrace the land in controversy, the plaintiffs by way of rebutting testimony, offered to give in evidence a copy of the entry on which the defendants’ survey and grant were founded ; also a copy of the survey made on said entry, and copies of several other surveys purporting to have been made for Joseph Porter by the same surveyor on the same 2d of September 1796, to wit: A survey of twenty-five thousand acres on the waters of Elk river and Gauley river; a survey of fifty thousand acres on Cole river, on the east side of the main forks and above the Spruce fork; a survey of twenty thousand acres on the waters of Cole river, and a survey of thirty thou *457 sand acr'es on the waters of Cole, Guyandotte and Sandy rivers. To this evidence the defendants objected; but the court permitted it to go to the jury and this constitutes the subject of the defendants sixth bill of exceptions.
It is easy to see that one of the questions strongly contested between the parties at the trial, was as to the identity or locality of the Porter survey of fifty thousand acres under which the defendants claimed. In order to give locality to that survey as the defendants claimed, it was necessary to reverse the course of every call which it contained. This upon the proofs they claimed the right to do. They insisted that the evidence proved an actual survey upon the ground as claimed by them to an extent sufficient to enable the jury to correct what they said were the mistaken calls in their survey and grant. On the other hand the plaintiff sought to repel the exercise of the right of changing and reversing the calls of the defendants’ grant, upon any notion of an actual survey having been made. He sought to make out that none such had in fact been made; that the defendants’ pretended survey was what is kn^wn in the familiar phrase of that part of the state as “ a chimney corner survey,” made by the surveyor in his office, without planting his instrument or stretching a chain upon the ground. As one item of proof conducing to this purpose, he offered the entry on which the survey was founded, which being supposed to precede the survey, yet called for the same identical courses and distances found in the latter; and for the same timber at three of the corners, and for a stake at a fourth. So he offered the surveys as showing that the same surveyor had reported five large surveys, two of fifty thousand acres each, one of thirty thousand, one of twenty-five thousand, and one of twenty thousand acres, as all made by him on the same 2d of September 1796, in *458 different aud remote sections within the wide limits of the then large county of Kanawha. Now what might be the weight due to this testimony, or whether the doubts and difficulties which it might serve to cast uPon the theory of an actual survey might be satisfactorily resolved and explained or the contrary, were matters not for the determination of the court. It tended in a certain degree to disprove the actual survey, and thus to repel the right to shift the survey from its calls upon the notion of such actual survey having been made. Certainly, the court could not say that it was so totally irrelevant that it should be excluded from the jury. That it might be susceptible of misconstruction, or that it might be used for an improper purpose, would furnish no reason for its exclusion; because it was the province and the duty of the court to guard against any such misconstruction or improper use, in the proper way, upon a proper application.
The seventh bill of exception taken by the defendants, was to the refusal of the court to give certain instructions asked for by them; and also to certain instructions which the court did give in lieu of some asked for.
The first of these instructions asked for by the defendants, related to the manner in which the sixty-one thousand and forty-eight acres conveyed by Joseph Blake and others to Elias H. Derby, was to be located and its boundary ascertained. It was parcel of the tract of ninety-four thousand six hundred acres originally patented to George K. Taylor; by him conveyed to Douthat and Chambers; and by them to the said Blake and the other grantors in the deed to Derby. And the question was as to where the division line should be run between that part of the ninety-four thousand six hundred acres conveyed to Derby and the part retained by Blake and the other grantors. In *459 the deed to Derby the land conveyed is described as beginning on the line of a survey made for one Samuel Smith, about six hundred and ninety poles from its northerly corner ; running thence with Smith’s line a given course and distance to two white oaks; thence by another course and distance given, crossing certain waters to a beech on the Harrison county line; thence with said line a given distance ; and from the termination of that distance by another course and distance given, to the place of beginning. And the instruction asked for was, that in locating the land the jury should begin at a stake six hundred and ninety poles from the northern corner of Smith’s survey upon his line, if that could be ascertained. To this instruction I can perceive no sufficient objection. The term “ about” must be disregarded, no corner having been in fact made, and the call being not for any object but for a mathematical point only. Cutts v. King, 5 Greenl. R. 482; Purinton v. Sedgley, 4 Greenl. R. 283; and it must be regarded as a special call for a stake at the termination of six hundred and ninety poles from Smith’s corner. In the absence of anything to control the call for course and distance, they must be conformed to ; and I can perceive no sufficient reason for varying the distance from Smith’s corner, at the end of which the beginning corner of the tract conveyed to Derby is to be placed. It is true the distance or length of the opposite line will have to be increased, or the course of the closing line of the survey varied. But this will not be sufficient to vary a call so specific as for a given distance upon a given course from a known corner of another survey. To say that distance shall yield to course or vice versa, where there is a conflict between the distance of one line and the course of another, would be entirely arbitrary; and the true rule seems to be that the one or the other shall be preferred according to the manifest intent of the parties *460 and the circumstances of the case. Preston's heirs v. Bowman, 2 Bibb. R. 493; Loring v. Norton, 8 Greenl. R. 61; Scamman v. Sawyer, 4 Greenl. R. 429. The distance at the end of which that portion of the entire tract granted Taylor, that was conveyed, by Blake and others to Derby was to begin, is the base line of the part retained; and knowing the length of the entire line, it must be supposed the grantors intended all the remainder to be the base line of the tract conveyed to Derby, reserving a base line of six hundred and ninety poles for the part retained; and if we are to say in which of the calls a mistake has been made, it would seem much moré likely to have been in some other rather than that for a given distance from Smith’s corner, and which must necessarily constitute a distinct and complete line of the part retained by the grantors. And if we look to the comparative quantities of the part intended to be conveyed t© Derby and that retained, it would seem that they must have intended to fix the beginning corner of the former at the place specified in the deed; and that any other course or distance should be varied rather than its distance from Smith’s corner should be increased. See Preston's heirs v. Bowman, 2 Bibb. R. 493, and Calvert v. Fitzgerald, Lit. Sel. Cases, p. 388; both cases in which course was made to yield to distance. I think too this question was unaffected by what had been done by the commissioners of forfeited lands in bringing these lands to sale, or by the action of the court upon their report, and other proceedings. Certainly both those commissioners .and the court intended to have regard to the true and proper division line between the tract conveyed to Derby and that retained. They did not intend, nor were they authorized, to create and set up a new and different line from that whieh had been fixed by the parties. It is true that in the plat made by the commissioners to illustrate the subject of their *461 sale, they fell into an error by locating the red oak corner where they did, and running from that point seven hundred poles on the course S. 37° E. for the post corner of the sixty-one thousand and forty-eight acres conveyed to Derby; but their report to the court and the description of that corner given in it, and in the deed to Chapman, sufficiently showed what corner was intended, and furnished the means of correcting the error by fixing the red oak corner where it properly stood at letter F on the plat, and running thence (not sixteen hundred poles as proposed by their second deed to Chapman,) but seven hundred poles, or perhaps six hundred and ninety, for the post corner of the tract conveyed to Derby. I think, therefore, that the Circuit court erred in refusing to give this instruction ; and that it also erred in giving the instruction which it did give in lieu of it. What was the operation and effect of the record of the proceedings of the commissioners was not a matter of fact to be left to the jury in the form submitted to them by this instruction, but a question of law to be passed on by the court; and if this record were introduced at all in this connection, the court should have instructed the jury that it did not affect the question as to where the division line referred to ought to be run. At the least the instruction which the court did give might serve to lead the jury to an erroneous conclusion.
The second instruction asked for by the defendants was that in fixing the boundaries of lot number 1, (purchased by Hiram Chapman at the commissioners’ sales,) as claimed by the plaintiff, no regard was to be had to any prior interfering claims of others not involved in the pending issue, nor to any private arrangements and divisions between the lessors of the plaintiff and Smith, Miller and others, who had become the purchasers of coterminous tracts (other parcels of the George K. Taylor grant of ninety-four thousand six *462 hundred acres,) at the same sales. It is difficult to understand precisely what was meant by the first of this instruction, or what prior interfering claims were in contemplation. And for the uncertainty and obscurity in which this part of the instruc- , 0 J 1 tion was involved, the court might, as it did, very properly refuse to give it. If it was intended to exclude from the consideration of the jury prior surveys, which, though conflicting with the Chambers survey, might yet, by proper references and connections, serve to identify it, and thus give location to lot number 1, which was parcel of it, it was clearly erroneous. But I do not perceive why the court refused the other part of the instruction. Lot number 1 was to be located by the title papers exhibited by the plaintiff, including the record of the sale by the commissioners of forfeited lands, and by the evidence given in connection therewith, explanatory of the various calls and references which they contained. Any private arrangements and divisions between the purchasers of the different lots after the sales, to which the defendants were no parties nor in any form privy or consenting, were res inter alios actae as to them ; and evidence of such private arrangements and divisions should not have been received as against them, to show how that lot was to be considered as bounded.
The third instruction asked by the defendants proposed to apply the rule as to the effect of an existing adversary possession at the time of the execution of a conveyance intended to operate under the statute of uses, in rendering the conveyance inoperative, to the case of a deed made by a commissioner of forfeited lands for lands- sold by him under the provisions of the statute; it being propounded upon the hypothesis that the jury should find that at the time of the conveyance by the commissioners to the said Hiram Chapman, the defendant Hamrick was in the actual adver *463 sary possession of the land in controversy, claiming title to the same. The court however refused to give the instruction; and in lieu thereof, instructed the jury that Hamrick’s possession could not prevent the title of the commonwealth from passing to Chapman by the deed of the commissioners, unless Hamrick was in a condition at the time of the forfeiture to claim the benefit thereof under the acts of assembly then in force for the protection of claimants under grants from the commonwealth of lands forfeited under other and different grants, or unless he had held possession adversely previous to the forfeiture, under claim of title, a sufficient length of time to bar a recovery by those in whose names the same had been forfeited or those claiming under them. The doctrine in relation to the effect of an existing adversary possession in a third person upon a conveyance of the land intended to operate under the statute of uses, can have no application to a conveyance of the commonwealth’s right made under authority of law, in the appointed mode, whether by grant under her seal, or by a deed duly executed by the commissioners of forfeited lands, or by any other officer whose duty it may be to execute the same. By the eighth section of the act of 30th March 1837, concerning western land titles, Sess. Acts, p. 11, where the purchaser of forfeited land has paid the purchase money, provision is made for the conveyance by the commissioners of all the commonwealth’s interest in the same, by deed; and it constitutes no part of the condition of such deed’s having due operation and effect that there should,,be no third person in possession at the time under claim of title. Its validity is wholly irrespective of any such possession unless it had continued long enough to bar a recovery at the suit of those in whose names or for whose default it had been so forfeited, or unless it were under such circumstances as, under the laws in force at the time, *464 would have caused the forfeiture to enure to the benefit the party so in possession. There can be no dis-nor adversary possession as against the commonwealth, in the legal acceptation of those terms as aPP^ec^ between individual citizens; and the possession that will render a conveyance under the statute of uses inoperative must be a possession adversary to the grantor, amounting to a disseizin. If at the time of the forfeiture or afterwards, the forfeiture is declared by law to enure to the benefit of the party in possession, a deed subsequently made by the commissioners would of course pass nothing to the purchaser. And so if at the time of the forfeiture, the claimants of the title so forfeited had been barred of their right to recover by the long continued adversary possession of the party holding, under the statute of limitations, the commonwealth would only take the title in the same plight and condition in which the claimants held it, and the commissioners’ deed would be inoperative to convey to the purchaser any other or better right to recover. But if the party in possession had acquired no such rights at the time of the forfeiture, from that time his adversary possession and the statute of limitations must cease to run as against the commonwealth, and the commissioners’ deed would pass her title thus acquired unaffected by the continued possession of the party holding with whatever claim of title. I think therefore the court properly refused to give this third instruction, and that there was no error in the instruction which it did give in lieu thereof.
By the fourth instruction asked for by the defendants, the court was called on to say to the jury that the record of the sale of the ninety-four thousand six hundred acres patented to George K. Taylor, was not sufficient to authorize a recovery on the demise in the name of Hiram Chapman ; but that the plaintiff must show that the provisions of the law under which the *465 sale was made had been fully complied with. It is not very clear what is meant by this instruction. I suppose, however, it is that the plaintiff was bound to show that all the proceedings of the commissioners and of the court from the report of the forfeiture by the former down to the deed of conveyance to the purchaser, inclusive, were regular and in due course. I think there is no foundation for this proposition. The proceeding was one in the nature of a judicial proceeding, and the orders and decree of the court made on it were conclusive at least upon strangers. As against them those claiming under it could not be called on to show its regularity. It is manifest from the whole scope and tenor of the acts on this subject, that the regularity of the sale of forfeited lands under the decree of a court was never intended to be drawn in question in any collateral proceeding. The fourth section of the act of 1837, Sess. Acts, p. 10, places the sales of these lands on the same footing as those of other lands directed to be sold by a decree of a court; and where such a sale has been made and confirmed, and a deed executed to the purchaser, he certainly cannot be called on to show that the proceedings in the suit which resulted in the decree of sale under which he purchased, and its confirmation, were regular, or if irregularities were shown, would he be affected. I think the instruction was properly refused.
The fifth instruction asked for related to the effect of two successive sales of the same land, under decrees of two different courts, by virtue of the forfeiture of two different titles supposed to have been vested under and by virtue of successive grants from the commonwealth for the same land. The sale under which the plaintiff claimed was made under a decree of the Circuit court of Kanawha, on the report of the commissioners for that county, that the tract of ninety-four thousand six hundred acres granted to George K- *466 Taylor by patent dated 4th November 1796, was forfeited to the commonwealth. The defendants claimed a sale made by the commissioners of Jackson county of a tract of fifty thousand acres granted to Samuel Boies and Frederick Fally on the 1st of April ^ x 1797. The order for the sale of this latter tract was made by the judge of the Jackson court in vacation on the 14th of October 1840, and the sale was reported to the court and confirmed by an order made on the 12th day of April 1841, by which also the commissioner was directed to make a deed to the purchaser, (the defendant Smith,) on the payment of the deferred installment. The proceeding for the sale of the ninety-four thousand six hundred acres under the forfeiture of the Taylor title, was not commenced till the 3d of November 1841, after the sale under the Boies and Fally grant had been confirmed. But the deed to Chapman, the purchaser of the land in controversy, at the sale under the order of the Kanawha court, was executed on the 11th of July 1842, while that to Smith the purchaser at the sale under the order of the Jackson court, for the Boies and Fally land, was not made till the 16th of September 1843. The defendants insisted that if the land in controversy was embraced both by the Taylor gi-ant and by the Boies and Fally grant, and if both those titles had become forfeited to the commonwealth, Smith the purchaser at the first sale under the decree of the Jackson court, thereby acquired all the interest and title vested in the commonwealth by both forfeitures, notwithstanding his deed was executed after that made to Chapman under the Kanawha sale; and they -moved the court to instruct the jury accordingly. The court, however, refused to give the instruction so asked for.
It cannot be doubted that the policy of the legislature, in the various acts concerning delinquent and forfeited lands, was not only to secure to the common *467 wealth her just dues, but also to quiet titles in the western part of the state; and to remove the check to population, and the settlement and improvement of the country which their unsettled condition served to create. This latter feature of the legislative policy is distinctly avowed in the preamble to the second section of the act of 1835, Sess. Acts, p. 12, and is plainly manifested by the general scope and tenor of the whole legislation upon the subject. And although there is no express declaration to that effect, yet it can scarcely be supposed that at the time of the passage of the act providing for the sale of forfeited lands, the fact so universally notorious in the western portion of the state, that the same lands had been in many instances- forfeited to the commonwealth under several different titles, was unknown to the legislature. Indeed we see that one of the duties assigned to the commissioners of delinquent' and forfeited lands by the third section of the act of 1837, Sess. Acts, p. 10, was to report to the court all the information they could procure in relation to the state of the title to such lands as had become forfeited; and no matter concerning the title to land supposed to be forfeited could be more pertinent or important than the fact in any given case that the land in question had been forfeited under several different rights. Now where in any given case the commissioners should report that a tract had been so forfeited under several and distinct titles, it can hardly be supposed that any court would direct two' several sales of the same land, putting several titles into market at the different sales. So if after a decree for the sale of a tract of land ascertained to be forfeited under one title, the commissioners were to report the same land as also forfeited under another and different title, no court would have thought it right to direct a second sale of the same land under the latter. The policy of the laws on the subject was to quiet titles as far as possi *468 ble, and to convey a good title under these sales as far as ^be ■commonwealth had the means of so doing. Cernothing could tend more directly to thwart this P°bcy than to give these laws the construction con-^en^e<^ bor by the defendant in error. If there could be several successive sales of the same land because it had been granted to several distinct patentees, all of whom, or those claiming under them, had suffered it to become forfeited by failing to comply with the revenue laws, and these sales but served to transfer to the different purchasers the several different titles of the parties so in default, the effect would only be to stir up the smouldering embers of litigation with all the newborn zeal which the different purchasers might be supposed to bring to the subject of their speculation. It “ would but serve to make confusion worse confounded,” and to aggravate all the evils which it was the purpose of the legislature to remove.
There is a plain difference between the sales authorized by the act of February 9th, 1814, 2 Rev. Code 1819, p. 542, and those to be made under the act of February 27th, 1837. By the express provisions of the former act, the sales were of the title and interest of the parties in default only. The commonwealth claimed not to be invested with the title to the lands, but only to assert a lien upon them for the taxes due her; the title remaining in the owner till the sale was made. The thirty-seventh section of that act accordingly expressly limits the operation of the deed made to the purchaser to the conveyance of such interest and estate as was vested in the person in whose name the land was returned delinquent, and the extinguishment of any use, trust or equity of redemption. The latter act presupposes that the title to the land sold is vested in the commonwealth at the time of the sale. It did not design to provide a means for creating or declaring forfeitures, but a convenient mode for ascertaining what *469 forfeitures had accrued, and of'disposing of the lands thus acquired by the commonwealth. It assumed that the acts declaring the forfeiture of lands for the of the owners to comply with the revenue laws, were sufficient proprio vigore to work out their own purpose, and to transfer the title perfectly and effectually to the commonwealth, and in the proper cases, through her to those claiming under another grant, who were in a condition to avail themselves of the provisions for their benefit. Hence it directs the lands to be sold as the property of the commonwealth, in all respects as in the case of other lands directed to be sold under decrees of the court; and directs the commissioner to convey to the purchaser all the interest of the commonwealth in the lands so sold. Ho discrimination is made between different titles that may have become vested in the commonwealth by virtue of several forfeitures ; but the whole, constituting the entire estate and interest of the commonwealth, is transferred to the purchaser. The deed to be made is to be a conveyance in fee simple of the commonwealth’s whole right derived to her by forfeiture, without regard to whatever delinquencies may have occasioned it, or to the different sources from which the several forfeitures, if more than one, may have accrued. It is true the commonwealth gives no warranty of the title conveyed; and if there be a better outstanding than that of the commonwealth, the purchaser takes no indemnity against it. But whatever right is in the commonwealth, derived by forfeiture under the revenue laws, must pass, and the deed conveying her interest must stand as an estoppel to the commonwealth to set up any other title, by forfeiture existing in her at the time of the sale. The effect of the deed, so far as title acquired by forfeiture is involved, would be the same as that of a grant obtained under the thirty-fifth section of the act of December 13th, 1792, 2 Rev. Code 1819, p. 525, which *470 made forfeited lands subject to entry and patent. If same laild had been forfeited under two several and a grant were obtained under the provisions this section, it can scarcely be doubted, I apprehend, that the whole of the commonwealth’s interest acquired by both forfeitures would pass to the grantee.
I deem it unnecessary to follow the counsel in the elaborate examination which they have made of the doctrine of forfeitures at common law; as I think it will afford but little aid in elucidating the nature and . effects of a forfeiture of land under our revenue laws. These rest upon grounds peculiar to themselves, and differ very materially in many respects, from forfeitures at the common law. They are declared for a special purpose to meet the exigency of the occasion which demanded them; and they are so moulded as to carry out the particular policy of the legislature. And moreover the point at issue is not what the commonwealth takes or holds under any or all of the different forfeitures, but what passes by her conveyance to her vendee after the different titles shall have been united in her by the respective forfeitures.
It is true the act of 22d March 1842, Sess. Acts, p. 13, provides in terms that all the commonwealth’s interest in land forfeited in different names shall be vested in the first purchaser, and any further sale of the same land is probibited. It also provides that the court shall on a proper report from the commissioners in any such case, make an order quieting the title; and it is limited in its operation so as not to impair the rights of purchasers at different sales made before the passage of the act; in all which cases the rights of the parties were to be determined by the previous laws. And it is insisted that these provisions would have been unnecessary if under the previous laws, the whole of the commonwealth’s interest passed to the purchaser at the first sale. I think however this act *471 is to be regarded rather as a legislative interpretation of previous laws though to take effect in the future only and to remove any doubt or ambiguity might be supposed to attend their construction, than as the enactment of a new provision. It was no doubt thought that it might be questioned whether under previous laws, the first sale passed the whole of the commonwealth’s title; and the legislature thought proper to put an end to all difficulty on that subject in future; but as the rights of previous purchasers must of course depend on the construction placed by the courts on the previous laws, it very properly excepted such cases from the operation of that act, leaving them to be settled under the laws in force at the time such previous purchases were made.
But it is insisted that as Chapman got the first deed from the commissioners of forfeited lands, the legal title thereby passed to him, whatever might be the equitable rights of Smith under his prior purchase; and that in this action Chapman being the holder of the legal title, must prevail. This renders it necessary to consider the precise effect of the sale made by the commissioners of Kanawha county, as to so much of the land as is embraced both within the boundaries of the Chambers survey and those of the Porter survey, if part thereof be embraced by both. The Chambers survey lies, as we 'have seen, in the county of Kanawha, and was sold by the commissioners for that court. The Porter survey, according to the pretensions of the plaintiffs in error, lies partly in the county of Jackson, and partly in the county of Kanawha, embracing a portion of the land covered by the Chambers survey; and it was sold, as we have seen, by the commissioner of Jackson county. By the 8th section of the act of March 15th, 1838, which is amendatory of the act of 1837, Sess. Acts 1838, p. 19, where a tract of land liable to be sold as forfeited, *472 lay partly in more than one couuty, it was to be reported and sold by the commissioner of that county in the greater part lay; but the validity of the sale was not to be in anywise affected if it turned out that the greater part did not lie in the county where ° r 'J so sola. So that if any part lay in that county, the sale would be good. Thus the court of Jackson county had jurisdiction to decree a sale of the Porter tract, though part might be in the county of Kanawha; and if it embraced a part of the tract covered by the Chambers survey, to that extent the exercise of jurisdiction by the Jackson court, on familiar principles, served to appropriate the subject and to oust the jurisdiction which the Kanawha court might otherwise properly have exercised. So that if the plaintiffs in error had in the opinion of the jury, sustained their pretensions as to the locality of the Porter survey, the Kanawha court had no jurdisdiction over that portion of the land common to both surveys; and nothing therefore passed to the purchaser under its decree as to so much of the land as is embraced by both. In this view I think the fifth instruction asked for propounded the law in substance correctly, and that the court erred in refusing to give it.
The last instruction asked for by the defendants, embraced in their seventh bill exceptions, related to the manner of identifying or giving locality to the Porter survey of fifty thousand acres under which they claimed. They asked the court to tell the jury, that if necessary they should vary the magnetic calls and locate it from the natural objects called for; and in so doing that they should, if necessary for the purpose of preserving the form of the survey, disregard the call to cross Mill creek, and locate the land by the other natural objects called for. The court declined to give the instruction in the form proposed; but told the *473 jury that if they were satisfied from the evidence the survey had been run without crossing Mill creek, they had the right to disregard that call and to locate land by the other calls in the grant; and if necessary, to reverse and change every call of the grant. The court thus in terms did instruct the jury as desired in relation to the right to vary the magnetic calls, and the only question is as to disregarding the call to cross Mill creek. The patent call is not for “ Mill creek” but for “ waters of Mill creek;” and there is a vagueness and want of precision in the reference to the form of the survey. It is not very clear whether the “ form of the survey” which the instruction affirms must be preserved, is that given by the plat of the surveyor which he is required to return with his certificate of the survey, or that obtained by platting according to the courses and distances given, or in some other mode. And I am by no means prepared to agree that to preserve any particular supposed form of survey would per se constitute a sufficient reason in every case to reject a call for a natural object, or an actually marked corner. On the contrary I apprehend cases. have been of not unfrequent occurrence in which a call for a natural object, as a creek or even a marked tree, has been held sufficient to control and materially vary the form which the survey would assume if such call had been omitted. The case of Newsom v. Pryor, 7 Wheat. R. 7, is of that character: And, indeed, most of the numerous cases in which natural objects found upon the ground have served to control both course and distance, will be found to be of the same class. I think the court might properly refuse, as it did, to give this instruction in the form proposed. But on the other hand, while the instruction which it did give was correct as far as it went if properly understood and applied, yet the terms in which it is couched are such as might perhaps lead the jury to. infer that *474 proof of an actual survey was the necessary condition exercise of the right to disregard the call for waters of Mill creek, and locate the land by the other calls. It is true the law providing the means of acfiu™nS title to waste and unappropriated lands requires the surveyor to make an actual survey, and to mark and bound it with proper abuttals either made for the purpose or adopted at the execution of the survey. And when a grant issues the legal presumption is that this duty has been performed. But if it be shown that in fact it has been wholly omitted, yet as this is the fault of the officer of the government, and not of the owner of the survey, his rights should not be lost when the omission can be supplied by any rational means and description furnished by the certificate of survey. And it is now well settled that a grant may be valid if the land granted can be identified though no actual survey had ever been made. Newsom v. Pryor, 7 Wheat. R. 7; Alexander v. Lively, 5 Monr. R. 159; Baxter v. Evett's lessee, 7 Monr. R. 329; Bockley v. Bryan, cited 1 Pirt. Dig. 113. The description given of the land intended to be granted and which is copied into the grant from the certificate of the survey, must be such as with the aid of proper parol testimony, will serve to identify and separate itffom the land surrounding. But in no case is it necessary that every call shall be satisfied. Cases of grants having conflicting calls are of not uncommon occur-. rence, but such a grant is not therefore necessarily void. If the conflict be irreconcilable, one or the other of the conflicting calls may be rejected, and locality given to the. survey by the rest; and in determining which call shall be disregarded, the rule is that the one less material and less certain shall yield to the one more material and more certain. Newsom v. Pryor, 7 Wheat. R. 7; Massie v. Watts, 6 Cranch R. 148; Benedict v. Gaylord, 11 Conn. R. 335. And if there be *475 found one call incongruous and irreconcilable with tbe other calls of the grant, but it appear that the survey can be located by those others, and it be shown whatever evidence, that this incongruous and incompatible call had been inserted in the certificate of v survey by mistake, it would seem that there certainly could be no less reason and propriety in rejecting it than if the mistake were demonstrated by proof that the lines had been actually run when the original survey purported to have been made, and that'no such object as that constituting the call in question any where occurred upon them.
The defendants’ eighth bill of exceptions related to the manner of running the line from the beginning corner of the Chambers survey (on which the patent to Taylor was founded,) at letter F on the plat to the next corner called for. The call was to run with Samuel Smith’s line S. 37° E. three thousand seven hundred and thirty-two poles to two white oaks, without naming them as a corner to any other survey: And the defendants insisted that the call must stop at the end of the three thousand seven hundred and thirty-two poles on Smith’s line, unless the jury were satisfied that the two white oaks named in the Chambers survey were made (marked as a corner I presume is intended,) for that survey at a different place, and that they were not authorized to extend that line beyond the distance called for, by proof that Smith’s corner was at a greater distance from the red oak at F. The court, however, refused to give an instruction in the form proposed; but told the jury that in the absence of proof fixing the corner elsewhere, it must be placed at the end of the distance called for: But if they were satisfied from the evidence that the corner stood at the same place as Gallatin’s or Smith’s corner, then they should extend the line without regard to distance to that corner; and if its position was denoted by letter G on the plat, they should extend it to that point. *476 The mere coincidence in the calls of the surveys for ^w0 white oaks as a corner might not per se be sufficient to fix the identity of the corners intended; but that the call in the Porter survey does not describe the white oaks as a corner of Gallatin’s or Smith’s survey, J is no sufficient reason why proof should be required that the two white oaks were actually marked as a corner to the former, or to exclude proof that the corner intended was that made for the latter. The surveyor, in making the Porter survey, might have adopted the corner marked for the Gallatin or Smith survey; and although he may have omitted by mistake to describe it as such in his certificate, yet the fact was open to proof aliunde, and if the evidence was sufficient to satisfy the jury of the identity of the corners intended, the effect was the same as if the Porter survey had called for the white oaks as being a corner of the Gallatin or Smith survey. I think, therefore, the instruction which the court gave was all that the defendants had a right to require, and that it was substantially correct.
The fourth bill of exceptions, which was passed by in the order of enumeration, is to the refusal of the court to grant a new trial; and it purports to set out all the facts proved in the cause. As, however, in the view I take, a new trial must be had, I deem it unnecessary to say anything further on the subject of this exception.
I am of opinion to reverse the judgment, and tti direct a new trial on the principles herein before indicated.
Allen, Daniel and Samuels, Js. concurred in the opinion of Lee, J.
Moncure, J. dissented.
Judgment reversed.